**Tom MEREDITH, et al., Petitioners,**

**v.**

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION, and United Mine Workers of America on behalf of William Keith Burgess, et al., Respondents.**

**No. 98-1359.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 21, 1999.

Decided June 4, 1999.

Robert M. Loeb, Attorney, United States Department of Justice, argued the cause for petitioners. With him on the briefs were Frank W. Hunger, Assistant Attorney General at the time the briefs were filed, David W. Ogden, Acting Assistant Attorney General, Wilma A. Lewis, United States Attorney, and Barbara C. Biddle, Assistant Director, United States Department of Justice.

Judith Rivlin argued the cause for respondents. With her on the brief was Grant Crandall. Norman M. Gleichman entered an appearance.

Before: EDWARDS, *Chief Judge*, WALD and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WALD.

WALD, *Circuit Judge*:

Several employees of the Mine Safety and Health Administration ("MSHA") petition for review of a decision by the Federal Mine Safety and Health Review Commission (the "Commission") holding MSHA officials amenable to suit under section 105(c)(1) of the Federal Mine Safety and Health Act of 1977 (the "Mine Act" or the "Act"), 30 U.S.C. § 815(c), for official actions that exceed their statutory or regulatory authority and amount to more than a mistake of law or fact in the exercise of delegated duties. *See United Mine Workers of America v. Secretary of Labor*, 20 F.M.S.H.R.C. 691, 700 (1998) ("*UMWA*"). Although we decide that the principle of administrative finality applies to Commission decisions, and that a Commission order remanding a matter back to an Administrative Law Judge for further development of the factual record would not, on its own, be final, we nevertheless conclude that we have jurisdiction to hear this appeal under the collateral order doctrine. Holding that the Mine Act's antidiscrimination provision does not apply to actions undertaken by MSHA officials under color of their authority, we grant the petition for review, vacate the Commission's decision and remand for the Commission to dismiss the respondents' complaints.

## I. Background

The United Mine Workers of America (the "UMWA"), acting on behalf of several individual miners and pursuant to 30 U.S.C. § 815(c),[1] filed two claims with the

1. Section 105(c) of the Mine Act, 30 U.S.C. § 815(c), provides that:

> (1) No person shall discharge or in any manner discriminate against or cause to be discharged or cause discrimination against or otherwise interfere with the exercise of the statutory rights of any miner [or] representative of miners ... in any coal or other mine subject to this chapter because such miner [or] representative of miners ... has

Secretary of Labor (the "Secretary") alleging that certain named MSHA officials had unlawfully discriminated against these union members for exercising rights protected by the Mine Act. According to the first discrimination complaint, an MSHA supervisor revealed to management the identity of miners who had written the MSHA District Manager expressing concern over what they considered to be inadequate safety inspection and enforcement practices at a Jim Walter Resources mine. In the incident underlying the second claim, an MSHA District Inspector allegedly retaliated against similar protestations of lax enforcement by ordering that the miners at the U.S. Steel–Concord Preparation Plant could no longer make health and safety complaints via telephone, as they had done in the past. Henceforth, he mandated, their complaints would have to be in writing and hand-delivered. In conjunction with each complaint, the UMWA sought an order directing MSHA district officials to cease and desist from retaliating or discriminating against miners who express their concerns over mine safety and MSHA safety enforcement, as well as civil penalties and any other relief deemed appropriate.[2]

After the Secretary of Labor dismissed the complaints on the ground that the Mine Act's anti-discrimination provisions do not cover the named defendants—the Secretary of Labor, the Mine Safety and Health Administration, and MSHA officials in their individual capacity—the UMWA sought review before the Federal Mine Safety and Health Review Commission. The two claims were assigned to an Administrative Law Judge ("ALJ") and consolidated. On the Secretary's motion, the ALJ dismissed each of the complaints for failure to state a cause of action. Relying on *Wagner v. Pittston Coal Group,* 12 F.M.S.H.R.C. 1178 (1990), *aff'd sub nom. Wagner v. Martin,* 947 F.2d 943 (table), 1991 WL 224257 (unpublished opinion) (4th Cir.1991), wherein the full Commission found section 105(c) inapplicable to the MSHA and its employees because the United States had not waived its immunity and consented to be sued, the ALJ concluded that neither the MSHA nor its employees are "persons" amenable to suit under Section 815(c).[3] *See United Mine*

filed or made a complaint under or related to this chapter, including a complaint notifying the operator or the operator's agent, or the representative of the miners at the coal or other mine of an alleged danger or safety or health violation in a coal or other mine, ... or because of the exercise by such miner ... of any statutory right afforded by this chapter.

(2) Any miner ... or representative of miners who believes that he has been discharged, interfered with, or otherwise discriminated against by any person in violation of this subsection may, within 60 days after such violation occurs, file a complaint with the Secretary alleging such discrimination. Upon receipt of such complaint, the Secretary shall forward a copy of the complaint to the respondent and shall cause such investigation to be made as he deems appropriate.... If upon such investigation, the Secretary determines that the provisions of this subsection have been violated, he shall immediately file a complaint with the Commission ... and propose an order granting appropriate relief. The Commission shall afford an opportunity for a hearing (in accordance with section 554 of Title 5 ...) and thereafter shall issue an order, based upon findings of fact, affirming, modifying, or vacating the Secretary's proposed order, or directing other appropriate relief....

(3) ... If the Secretary, upon investigation, determines that the provisions of this subsection have not been violated, the complainant shall have the right ... to file an action in his own behalf before the Commission, charging discrimination or interference in violation of paragraph (1). The Commission shall afford an opportunity for a hearing (in accordance with section 554 of Title 5 ...), and thereafter shall issue an order, based upon findings of fact, dismissing or sustaining the complainant's charges and, if the charges are sustained, granting such relief as it deems appropriate....

2. The first discrimination complaint additionally sought payment of attorney's fees.

3. The Mine Act defines the term "person" to encompass "any individual, partnership, association, corporation, firm, subsidiary of a corporation, or other organization." 30 U.S.C. § 802(f).

*Workers of America v. Secretary of Labor,* 19 F.M.S.H.R.C. 294, 295 (1997).

The UMWA appealed the ALJ's Order of Consolidation and Dismissal to the full Commission, which in turn granted the petition for discretionary review. After briefing and oral argument, the Federal Mine Safety and Health Review Commission issued a July 2, 1998 Opinion which affirmed the ALJ's decision in part and reversed in part. *See UMWA,* 20 F.M.S.H.R.C. at 699–700. First, the Commission reaffirmed its *Wagner* decision insofar as it had held that the MSHA was not a "person" subject to the Mine Act's anti-discrimination provision.[4] *See id.* at 696. In three separate opinions, however, the Commission unanimously overruled that part of *Wagner* holding MSHA employees to be similarly immune from suit under section 105(c). While principles of sovereign immunity secured the MSHA itself from suit, the Commission reasoned that individual MSHA officials operating beyond the scope of their authority ceased to wear, and to be protected by, the mantle of the sovereign. To the extent that individual officials exceed their delegated statutory or regulatory authority, it concluded, they operate as "persons" for purposes of section 105(c) and can be subjected to individual capacity suits. Accordingly, the Commission vacated the dismissal of the complaints, remanded for development of the factual record, and directed the ALJ to determine whether the challenged actions exceeded the scope of the defendant officials' authority and constituted more than a mistake of law or fact. The individual MSHA officials (collectively the "petitioners") petitioned for review of this determination.

Petitioners challenge the Commission's holding on three separate grounds, broadly alleging that Congress did not intend individual MSHA officials acting under color of authority to be covered by the terms of section 105(c). First, arguing from the language and structure of the Mine Act, petitioners contend that MSHA employees cannot be encompassed by the term "persons" because they are instead subsumed by a separate statutory term, the "Secretary." *See* 30 U.S.C. § 802(a) ("'Secretary' means the Secretary of Labor or his delegate."). Drawing from the logic of the statute, as evidenced by the remedial language describing the list of penalties available to the Commission, petitioners next assert that section 105(c)'s proscriptions are addressed solely to mine operators and their affiliates. Finally, to the extent that there is any ambiguity within the statutory scheme, petitioners contend that both the Commission and this court must defer to the Secretary of Labor's authoritative and reasonable interpretation of the statute to exclude MSHA officials from its coverage. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Because the circuits, following *Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (since the Occupational Health and Safety Act of 1970 invests rulemaking and enforcement powers in the Secretary of Labor, the adjudicatory Occupational Safety and Health Review Commission must defer to the Secretary's reasonable interpretations of statutory and regulatory language), have uniformly held that the Commission must accord proper deference to the Secretary's policy and discretionary decisions, petitioners contend that the Commission's failure to adhere to an eminently reasonable interpretation must be reversed.

## II. Discussion

### A. *Jurisdiction*

#### 1. *The Need for a Final Order*

We must first determine whether or not we have jurisdiction to hear this

4. Four of the five Commissioners adhered to this portion of the Commission's ruling. *See UMWA,* 20 F.M.S.H.R.C. at 697, 702.

petition for review. Subject to a few limited exceptions, appellate review of administrative action is restricted to final agency orders. *See Bell v. New Jersey,* 461 U.S. 773, 778, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983) ("The strong presumption is that judicial review will be available only when agency action becomes final."). We have held repeatedly and across agency contexts that an order will be considered final to the extent that it "imposes an obligation, denies a right, or fixes some legal relationship, usually at the consummation of an administrative process." *Transwestern Pipeline Co. v. FERC,* 59 F.3d 222, 226 (D.C.Cir.1995) (quoting *State of Alaska v. FERC,* 980 F.2d 761, 763 (D.C.Cir. 1992)). *See also Burlington N. R.R. Co. v. Surface Transp. Bd.,* 75 F.3d 685, 690 (D.C.Cir.1996); *Mountain States Tel. & Tel. Co. v. FCC,* 939 F.2d 1021, 1027 (D.C.Cir.1991). Here, the Commission's order reinstating the miners' complaints and remanding the matter to the ALJ for further record development clearly falls outside the heartland of final action. *See Occidental Petroleum Corp. v. SEC,* 873 F.2d 325, 329 (D.C.Cir.1989) (as a general rule, district court order remanding matter to administrative agency is not a final order); *Carolina Power & Light Co. v. United States Dep't of Labor,* 43 F.3d 912, 914–15 (4th Cir.1995) (Secretary of Labor's order remanding matter to ALJ is not a final order and so not subject to judicial review); *Fieldcrest Mills, Inc. v. OSHRC,* 545 F.2d 1384, 1385–86 (4th Cir.1976) (per curiam) (Occupational Safety and Health Review Commission decision reversing ALJ's summary judgment and remanding for trial on the merits is not a final order). *Cf. Washington Metropolitan Area Transit Authority v. Director, Office of Workers' Compensation Programs,* 824 F.2d 94, 95 (D.C.Cir.1987) (per curiam) (Department of Labor Benefits Review Board decision remanding case to ALJ for determination of damages and further fact-finding is not final and hence not immediately appealable).

Seeking to avert the finality norm, petitioners first contend that the Mine Act provides a specific, congressionally sanctioned exception. The anti-discrimination provision at issue herein—section 105(c)(3)—states that "[a]ny order issued by the Commission under this paragraph shall be subject to judicial review in accordance with [section 106 of the Mine Act]." 30 U.S.C. § 815(c)(3). Section 106(a)(1) itself provides that "[a]ny person adversely affected or aggrieved by an order of the Commission issued under this chapter may obtain a review of such order in ... the United States Court of Appeals for the District of Columbia Circuit...." 30 U.S.C. § 816(a)(1). Petitioners find this language significant for two reasons. First, in contrast to numerous other statutory review provisions, the Mine Act expressly refers to *orders* rather than to *final orders. See, e.g.,* 29 U.S.C. § 160(f) (granting courts of appeals jurisdiction to review a "final order of the [NLRB]" responding to unfair labor practice allegations); 28 U.S.C. § 2342(1) (granting courts of appeals jurisdiction to review "final orders of the Federal Communications Commission"); 33 U.S.C. § 921(c) (providing for review of "final orders" from the Benefits Review Board). Secondly, the Mine Act itself also distinguishes *orders* from *final orders,* as section 106(b), in contrast to section 106(a)(1), provides that "[t]he Secretary may also obtain review or enforcement of any *final order* of the Commission...." 30 U.S.C. § 816(b) (emphasis added). Petitioners contend that Congress, by omitting the modifier "final" in section 106(a)(1), signaled an express intent to allow for the review of other than final orders. According to petitioners, the statutory reference to persons "adversely affected or aggrieved" by Commission orders explicitly provides an alternative limiting principle to that of absolute finality, requiring that a party suffer some concrete consequences before seeking judicial review.

Despite petitioners' valiant efforts at semantic reconstruction, we do not discern any exception to the principle of final-

ity within the Mine Act's judicial review provisions. While a direct expression of Congress' will would necessarily control, we do not believe that the statute contains any directive to depart from the background norm of administrative law that judicial review awaits completion of the administrative process. If anything, the legislative history accompanying passage of the Mine Act bespeaks the opposite. Both the Senate Report and the Joint Explanatory Statement of the Committee of Conference describe section 106(a)(1) as providing for the review of final orders; no mention is made of earlier review and no distinction is drawn between "the Secretary" and other "persons." *See* S.Rep. No. 95–181, at 13 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3401, 3413 ("Persons adversely affected by the Commission's *final order* may obtain a review of such order in any appropriate U.S. court of appeals. The Secretary may also obtain review or enforcement of any *final order*....") (emphases added); H.R. Conf. Rep. No. 95–655, at 53 (1977) *reprinted in* 1977 U.S.C.C.A.N. 3485, 3501 (describing the conference substitute as conforming to the Senate bill, which itself provides for "a *uniform* procedure [for judicial review] applicable to *all final orders* of the Commission") (emphases added). In the absence of any clear evidence that Congress intended a more generous review than the norm, we join our sister circuits in holding that section 106(a)(1) of the Mine Act limits appellate review to final agency action. *See Jim Walter Resources, Inc. v. Federal Mine Safety & Health Review Comm'n,* 920 F.2d 738, 743–44 (11th Cir.1990); *Monterey Coal Co. v. Federal Mine Safety & Health Review Comm'n,* 635 F.2d 291, 292–93 (4th Cir.1980).

2. *The Collateral Order Doctrine*

Petitioners next contend that the Commission's order should be reviewable under the collateral order doctrine. Relying upon a line of cases beginning with *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), petitioners claim that the Commission's remand order falls within the narrow category of "collateral" judgments that may be reviewed before the agency has taken final action on a matter because it denied their claim of qualified immunity. While petitioners accurately characterize the Commission's decision, the conclusion they draw therefrom lacks merit. In our view, the assertion of qualified immunity and the Commission's decision based thereon were both misguided. The qualified immunity doctrine does not apply to actions seeking equitable relief against public officials. *See* discussion *infra* pp. 1048–50. Accordingly, while we do ultimately hold that the collateral order doctrine provides a basis for our jurisdiction to hear this petition for review, *see Digital Equip. Corp. v. Desktop Direct, Inc.,* 511 U.S. 863, 869 n. 3, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994) (satisfying the collateral order doctrine requirements goes to "an appellate court's subject matter jurisdiction"), we reach this conclusion for different reasons.

At least since *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), it has been recognized that the circuit courts have jurisdiction to hear appeals from a limited category of decisions that fall within the bounds of the so-called collateral order doctrine. As articulated in *Cohen* and reiterated in *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), even though a disposition does not end the litigation, it qualifies for immediate review if it: (i) conclusively determines a disputed question; (ii) resolves an important issue completely separate from the merits of the action; and (iii) is effectively unreviewable on appeal from a final judgment. *See Coopers & Lybrand,* 437 U.S. at 468, 98 S.Ct. 2454. The background principle that certain appeals from a trial court decision denying a qualified immunity defense satisfy the *Cohen* criteria is equally well settled. *See Johnson v. Jones,* 515 U.S. 304, 311–12, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). In the qualified immunity arena, the Supreme Court has drawn a distinction between two categories of cases, only one of which merits

immediate appellate review: an interlocutory decision that rests upon the purely legal question of whether or not an official's actions violate clearly established law does satisfy the *Cohen* criteria, *see Behrens v. Pelletier*, 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), while an interlocutory decision that denies summary judgment because of the presence of triable issues of fact does not. *See Johnson*, 515 U.S. at 317–18, 115 S.Ct. 2151. *See also Digital Equip.*, 511 U.S. at 868, 114 S.Ct. 1992 (issue of appealability should be determined by the category to which a particular case belongs). Unsurprisingly, petitioners claim that this appeal falls within the latter category while respondents allege that it falls within the former. Because we frame the issue differently, we avoid the need for choosing between the two.

While an assertion of qualified immunity may shield a government official from answering for his actions in a suit for damages, *see Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (restricting qualified immunity protection to actions where official conduct did not violate a clearly established legal right), such immunity does not extend to a suit seeking equitable relief. *See Burnham v. Ianni*, 119 F.3d 668, 673 n. 7 (8th Cir.1997) (defense of qualified immunity protects officials only from suit for monetary damages, not injunctive relief); *Keenan v. Hall*, 83 F.3d 1083, 1093 (9th Cir. 1996) (same); *Rodriguez v. City of New York*, 72 F.3d 1051, 1065 (2d Cir.1995) (same). In a prototypical case brought under the Administrative Procedure Act, for example, neither an agency nor a named government official can avoid judicial scrutiny by claiming that the particular action under review did not violate a clearly established legal right. Nor could that official circumvent the doctrine of administrative finality and obtain appellate review of non-final agency action by pointing to the denial of asserted qualified immunity. In this case, the UMWA sought an order under section 105(c) of the Mine Act, *see* 30 U.S.C. § 815(c)(2)-(3), directing the party accused of unlawful discrimination to take affirmative action to abate the violation—a purely equitable remedy. In one of the complaints, the UMWA additionally sought payment of attorney's fees; but where attorney's fees are provided for by statute, as here, qualified immunity has no application. *See* 30 U.S.C. § 815(c)(3) ("Whenever an order is issued sustaining the complainant's charges under this subsection, a sum equal to the aggregate amount of all costs and expenses (including attorney's fees) ... reasonably incurred ... shall be assessed against the person committing such violation."); *Mireles v. Waco*, 502 U.S. 9, 10 n. 1, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991) (official immunity does not secure judge from suit for attorney's fees authorized by statute); *Copeland v. Marshall*, 641 F.2d 880, 907 n. 68 (D.C.Cir.1980) (in banc) (noting the Supreme Court's observation that "Congress intended to permit attorney's fees awards in cases in which prospective relief was properly awarded against defendants who would be immune from damage awards" (quoting *Supreme Court of Va. v. Consumers Union*, 446 U.S. 719, 738, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980))). *Cf. Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (in the context of Eleventh Amendment immunity, attorney's fees properly treated as ancillary to injunctive relief).[5] Accordingly, petitioners

5. Although each discrimination complaint additionally sought an assessment of civil penalties, it is not clear whether this request remains part of the case. In its decision reinstating the complaints, the Commission directed the ALJ, should it find the MSHA officials subject to suit, to order "appropriate specific relief." *UMWA*, 20 F.M.S.H.R.C. at 700. In any event, a civil penalty constitutes something other than monetary damages, which the Supreme Court has described as "a sum of money used as compensatory relief," *Department of the Army v. Blue Fox, Inc.*, — U.S. —, —, 119 S.Ct. 687, 691, 142 L.Ed.2d 718 (1999). *See also Bowen v. Massachusetts*, 487 U.S. 879, 893, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) ("Our cases have long recognized the distinction between an action at law for damages—which are in-

cannot interpose qualified immunity as a defense to the UMWA's section 105(c) claim.

That said, we nevertheless share with petitioners the conviction that, under the collateral order doctrine, this petition for review is properly before us. Our path to this holding entails a series of steps. First, we recognize that a Commission order remanding a matter to an ALJ will not, on its own, satisfy the principle of finality that we have held to be inherent in section 106(a)(1). *See* discussion *supra* pp. 1047–48. In this case, however, petitioners contend that the UMWA has failed to state a claim against them because the statutory provision under which the UMWA filed its complaint—section 105(c) of the Mine Act—does not provide a cause of action against MSHA employees for actions taken under color of their authority.[6] Accordingly, we must determine whether the Commission's order operates as a "final decision" under the "practical" construction of finality the Supreme Court articulated in *Cohen.*

Before turning to an examination of the *Cohen* criterion, we first make explicit what would otherwise be implicit in our recognition of *Cohen*'s applicability. The collateral order doctrine extends beyond the confines of 28 U.S.C. § 1291 to encompass the principle of administrative finality contained in section 106(a) of the Mine Act. As we recognized in *Community Broadcasting of Boston, Inc. v. FCC,* 546 F.2d 1022, 1024 (D.C.Cir.1976), interpreting a provision of the Communications Act authorizing judicial review of FCC "final orders," both the finality requirement articulated in section 1291 and that generally prevailing in administrative law reflect a judgment that the judicial and administrative processes should proceed, where practicable, without interruption. Towards this end, courts have allowed interlocutory appeals "only in exceptional cases, a requirement that partakes of similar meanings in both contexts." *Id. See also*

tended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief....."). For purposes of the Mine Act, the available civil penalties are all payable to the United States Treasury. *See* 30 U.S.C. § 820(j) ("Civil penalties owed under this chapter shall be paid to the Secretary for deposit into the Treasury of the United States...."). In light of the time-honored distinction between damages actions and those seeking equitable or specific relief, *see, e.g., Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (Eleventh Amendment is not a bar to suit seeking prospective injunctive relief); *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (attorney's fees appropriately levied against state actor ancillary to award of injunctive relief), and the fact that qualified immunity applies only to actions seeking monetary damages, *see supra* pp. 1048–49, we think it follows that qualified immunity does not bar a claim seeking civil penalties.

6. Petitioners did raise this point before the Commission, thereby satisfying the dictates of section 106(a)(1) of Mine Act and allowing us to proceed. *See* 30 U.S.C. § 816(a)(1) ("No objection that has not been urged before the Commission shall be considered by the [reviewing] court...."). Nevertheless, they subsume this contention within a larger argument that we believe to be misguided. Acting under the presumption that qualified immunity could and should apply, petitioners follow the two-step mode of analysis articulated in *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), which directs a court to determine whether or not the plaintiff has asserted a violation of a clearly established right as a necessary precondition to any further inquiry under *Harlow*. Although we reject the assertion of qualified immunity because the UMWA has sought only equitable relief, we nevertheless find *Siegert* instructive to the largely analogous question that we face–whether a federal official should be subjected to the burdens accompanying litigation for certain actions taken under color of authority. Accordingly, once we establish our jurisdiction, we proceed by then questioning whether the UMWA has asserted a valid claim against the petitioners. While this inquiry differs somewhat from that prevailing in the qualified immunity context, in that the preliminary question involves whether a claim exists at all instead of merely whether that claim alleges violation of a clearly established right, the lexical priority of the inquiries are identical.

*DRG Funding Corp. v. Secretary of HUD,* 76 F.3d 1212, 1221 (D.C.Cir.1996) (Ginsburg, J., concurring) (marshaling cases in support of the proposition that the collateral order doctrine applies to the APA's finality requirement); *Carolina Power & Light,* 43 F.3d at 916 ("It is well-settled that [the *Cohen*] requirements of the collateral order doctrine apply not only to judicial decisions, but also to appeals from executive agency action."). Mindful of the policies underlying the principle of finality, as well as the institutional costs of premature judicial intervention, we nevertheless recognize the need for immediate review in those exceptional cases that fall within the strictures of the collateral order doctrine.

As the Supreme Court's recent discussion of the doctrine makes evident, a collateral order will amount to a final (and hence reviewable) decision when it satisfies each of the "separability," "unreviewability," and "conclusiveness" prongs of *Cohen. See, e.g., Johnson,* 515 U.S. at 310, 115 S.Ct. 2151. Because we need not be concerned with a potentially fact-laden qualified immunity inquiry, the dispositive factor in *Johnson,* the question of separability is easily resolved. A determination of whether section 105(c) covers MSHA employees acting under color of their authority is completely independent from the merits of whether petitioners committed the acts charged in the complaint. It has little, if anything, to do with the substance of the underlying allegations. As in *Mitchell v. Forsyth,* which provides an instructive analogy for assessing each of the *Cohen* factors, we confront a pure and independent question of law. *See Mitchell,* 472 U.S. at 528, 105 S.Ct. 2806.

The next two prongs present more difficult questions and require a more in-depth analysis. We begin with *Mitchell,* wherein the Supreme Court concluded that a district court's rejection of the defendant's qualified immunity-based summary judgment motion constituted a "final decision" subject to immediate appellate review. After first interpreting qualified immunity as providing an entitlement to avoid the burdens of both discovery and trial, the Court determined that a denial of qualified immunity, in certain circumstances, must be immediately appealable. Because immunity from the burdens of litigation "is effectively lost if a case is erroneously permitted to go to trial," *id.* at 526, 105 S.Ct. 2806, the policies underlying qualified immunity favored resolution of certain immunity claims prior to full discovery. We recently described such claims as "appeals of the 'I cannot, as a matter of law, be held liable' variety." *Farmer v. Moritsugu,* 163 F.3d 610, 614 (D.C.Cir.1998). Although this case does not strictly fall within the holding of *Mitchell,* in that we confront petitioners' assertion that they are not amenable to suit under section 105(c) rather than their being the bearers of qualified immunity,[7] we believe that the interests underlying the Court's decision apply with equal force. First and foremost, the consequences of unwarranted litigation are analogous—"distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Mitchell,* 472 U.S. at 526, 105 S.Ct. 2806 (quoting *Harlow,* 457 U.S. at 816, 102 S.Ct. 2727). To the extent that the Mine Act's antidiscrimination provision simply does not apply to MSHA officials, a question which the courts would only have to answer once, such employees should be immune from the burdens of administrative and judicial proceedings thereunder. This immunity cannot be effective, as the Court recognized in *Mitchell,* unless it provides a right to avoid suit altogether rather than a mere defense to liability. *See id. Cf. Jungquist*

7. A second distinction lies implicit in this statement, namely that this case involves an interpretation of 30 U.S.C. § 816(a) rather than the grant of appellate jurisdiction over district court decisions contained in 28 U.S.C. § 1291. *See United States v. Cisneros,* 169 F.3d 763, 767 (D.C.Cir.1999) ("While the collateral order doctrine of *Cohen* is sometimes described as an exception to the final judgment rule, it is more accurately treated as an interpretation of 'final decisions' as used in 28 U.S.C. § 1291.").

*v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020, 1026 (D.C.Cir.1997) (as immunity under Foreign Sovereign Immunity Act can only be vindicated if considered an immunity from burdens of litigation, appeal satisfies three *Cohen* factors); *Kimbro v. Velten,* 30 F.3d 1501, 1503 (D.C.Cir.1994) (appeal from order resubstituting original defendant satisfies *Cohen* criteria as the Westfall Act grants federal employees acting within scope of employment immunity from trial, not merely from liability).

Having reached the conclusion that the lack of any cause of action against these MSHA employees would operate as a right against compelled participation in any section 105(c) proceeding, it inexorably follows, for the reasons stated in *Mitchell,* that the unreviewability and conclusiveness prongs of *Cohen* are also satisfied. First, the Commission's *UMWA* decision conclusively determined the petitioners' claimed right not to face administrative or judicial proceedings under section 105(c). Whether or not the ALJ on remand found that the officials exceeded their delegated statutory or regulatory authority, they would have been forced to defend themselves in these agency proceedings. Accordingly, "*Cohen*'s threshold requirement of a fully consummated decision is satisfied" in this case. *Abney v. United States,* 431 U.S. 651, 659, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). For the same reason, were the proceedings before the ALJ to move forward, the Commission's decision would be effectively unreviewable on appeal. Once administrative proceedings have run their course, the interest in avoiding them has been vitiated and cannot be vindicated. *See KiSKA Construction Corp. v. WMATA,* 167 F.3d 608 (D.C.Cir.1999) (since WMATA's interest in avoiding proceedings could not otherwise be vindicated, determination that it is an agency subject to D.C. Freedom of Information Act is appealable collateral order). Accordingly, we conclude that the Commission's collateral judgment constitutes a "final order" for purposes of 30 U.S.C. § 816(a)(1), and that we have jurisdiction to hear this petition for review.

### B. *Are MSHA Officials "Persons" Under the Mine Act?*

Section 105(c)(1) of the Mine Act provides, in relevant part, that "[n]o person shall ... in any manner discriminate against ... or cause discrimination against or otherwise interfere with the exercise of the statutory rights of any miner, [or] representative of miners ... because such miner [or] representative of miners ... has filed or made a complaint under ... this chapter...." 30 U.S.C. § 815(c)(1). The matter of our jurisdiction resolved, we now face a rather narrow question of statutory interpretation; *i.e.,* whether the word "person," as used in this statutory provision, encompasses MSHA officials acting under color of their authority.[8] Faced with a dispute between the Secretary of Labor and the Commission over the proper interpretation of the Mine Act, our analysis necessarily begins with *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Secretary of Labor v. Federal Mine Safety & Health Review Comm'n,* 111 F.3d 913, 916 (D.C.Cir.1997) (applying *Chevron* to interpretive dispute between the Secretary and the Commission).

8. Although the MSHA officials have been sued in their personal capacity, the parties do not dispute that the actions forming the basis of the two discrimination complaints were taken in the course of petitioners' official duties. Since we do not confront a question of sovereign immunity, and we reject the proffered cloak of qualified immunity, whether or not petitioners' acts exceeded the scope of their delegated statutory and regulatory authority is ultimately beside the point. *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), and *Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963) do not apply. Instead, the relevant distinction is between acts taken under color of authority and actions taken in a purely private capacity. We limit our discussion to the former.

When reviewing an agency's construction of the statute it administers, *Chevron* directs the courts first to ask whether Congress has spoken to the specific question at issue. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. In undertaking this assessment, we recognize that difficulty and ambiguity are not synonymous; in other words, the presence of a difficult question of statutory construction does not necessarily render that provision ambiguous for purposes of *Chevron.* However demanding the exercise, we must discern whether Congress had an intent on the precise question we face. Utilizing the traditional tools of statutory construction, as the Supreme Court instructed in *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), we find that the text and structure of the Mine Act, as well as the legislative history, inexorably lead to a single conclusion. The Mine Act's anti-discrimination provision does not apply to MSHA employees for actions taken under color of their authority.[9]

As always, the starting point of analysis is the text of the statute. The Mine Act defines the term "person" to mean "any individual, partnership, association, corporation, firm, subsidiary of a corporation, or other organization." 30 U.S.C. § 802(f). The UMWA contends that, in ordinary usage, MSHA officials[10] are clearly "individuals," and should therefore be held subject to suit under section 105(c). In response, petitioners point to a number of statutes in which Congress has expressly included public officials or employees within the definition of the term "persons." *See, e.g.,* 15 U.S.C. § 330(2) (person "means any individual, corporation ... or any other organization ... performing weather modification activities, except where acting solely as an employee, agent, or independent contractor of the Federal Government"); 16 U.S.C. § 470bb(6) (person means "an individual, corporation ..., or any other private entity or any officer, employee, agent, department, or instrumentality of the United States"); 16 U.S.C. § 4903(4) (defining person as "an individual, corporation, partnership, trust, association, or any other private entity; or any officer, employee, agent, department, or instrumentality of the Federal Government ..."); 18 U.S.C. § 2510(6) (person means "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation"); 33 U.S.C. § 1402(e) (person means "any private person or entity, or any officer, employee, agent, department, agency, or instrumentality of the Federal Government ..."); 50 U.S.C. § 1801(m) (person means "any individual, including any officer or employee of the Federal Government ..."). Given the fact that Congress has elsewhere utilized the term "person" both to include and to exclude government officials from its coverage, we do not believe that because

9. Because we resolve this case under *Chevron's* first prong, we need not determine whether the deference that the Secretary customarily receives when interpreting the Mine Act should obtain when the Secretary's reading would limit the scope of external oversight to which the Secretary could otherwise be subject. *Cf. Secretary of Labor v. Federal Mine Safety & Health Review Commission,* 111 F.3d 913, 920 (D.C.Cir.1997) (Secretary, not the Commission, is entitled to deference in interpreting 30 U.S.C § 814(d)(1)).

10. Because the complaints are against the MSHA officials in their individual, rather than official capacity, the *Will-Wilson* rule—that absent an affirmative contrary showing of legislative intent, "the term 'person' does not include the sovereign, [and] statutes employing the [word] are ordinarily construed to exclude it"—does not apply. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 64, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (quoting *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 667, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979) (quoting *United States v. Cooper Corp.,* 312 U.S. 600, 604, 61 S.Ct. 742, 85 L.Ed. 1071 (1941))) (alteration in original).

MSHA employees are literally "individuals," that they are necessarily encompassed by the Mine Act's use of that term. *See Bell Atlantic Tel. Cos. v. FCC,* 131 F.3d 1044, 1045 (D.C.Cir.1997) (plain meaning and literal meaning are not equivalents). Focusing on the text alone, the plain meaning is elusive.[11]

For clarification, we next look to the text and structure of the Mine Act as a whole, and to the dual-enforcement regime established thereby. In so doing, we "follow the cardinal rule that a statute is to be read as a whole," *King v. St. Vincent's Hosp.,* 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) (citing *Massachusetts v. Morash,* 490 U.S. 107, 115, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989)), "since the meaning of statutory language, plain or not, depends on context." *Conroy v. Aniskoff,* 507 U.S. 511, 515, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993). This shift in perspective is ultimately dispositive; by moving beyond the text of section 105(c) to examine the statutory scheme in which it reposes, the implausibility of the UMWA's proffered construction becomes undeniable. *Cf. Hiler v. Brown,* 177 F.3d 542, 547 (6th Cir.1999) (rejecting literal reading of "person" where individual capacity suits against federal officials for unlawful retaliation would frustrate the Rehabilitation Act's statutory framework). Replicating the division of responsibilities between the Secretary of Labor and the Occupational Safety and Health Review Commission, the Mine Act places adjudicative authority in the Federal Mine Safety and Health Review Commission, an independent agency whose sole function lies in resolving claims brought under the Mine Act. Responsibility for enforcement of its protections, by contrast, rests primarily in the Secretary of Labor's hands.[12] When a miner files a section 105(c) discrimination complaint, the Mine Act directs the Secretary to undertake an immediate investigation and, should the Secretary countenance the discrimination claim, to file an immediate complaint with the Commission. *See* 30 U.S.C. § 815(c)(2). In addition, the Secretary prosecutes such claims before the Commission, *see Wagner,* 12 F.M.S.H.R.C. at 1185, and proposes appropriate relief. *See* 30 U.S.C. § 815(c)(2).[13] Were the term "persons" read to encompass MSHA officials acting in their official capacity, this distribution of authority would leave the Secretary in the anomalous position of initiating formal proceedings against its own subordinates before an independent agency. We cannot assume that Congress intended such a bizarre administrative scheme.

To the extent that MSHA officials merit reprobation for their on-the-job behavior, the Secretary has the power (subject to the protections articulated in the Civil Service Reform Act ("CSRA")) to

11. We additionally reject petitioners argument that MSHA employees cannot be considered "persons" under the Mine Act because they are instead encompassed by the term the "Secretary." We can divine no reason why terms defined by the statute need be considered mutually exclusive; in fact, other terms clearly spill over into one another. A mining company, for example, would be both a "person" and an "operator." *See* 30 U.S.C. § 802(d) (" 'operator' means any owner, lessee, or other person who operates, controls, or supervises a coal or other mine ..."); 30 U.S.C. § 802(f) (" 'person' means any ... corporation, firm ...").

12. Strictly speaking, responsibility for enforcing the Mine Act rests with the Secretary, acting through the Mine Safety and Health Administration. *See* 29 U.S.C. § 557a ("There is established in the Department of Labor a Mine Safety and Health Administration to be headed by an Assistant Secretary of Labor for Mine Safety and Health.... The Secretary is authorized and *directed,* except as specifically provided otherwise to carry out his functions under the [Mine Act] through the Mine Safety and Health Administration.") (emphasis added). Since the Mine Act speaks in terms of "the Secretary," rather than the more descriptive "the Secretary, acting through the MSHA," we shall do the same.

13. As this case illustrates, the Mine Act leaves a residual capacity to initiate proceedings before the Commission in the hands of individual miners. *See* 30 U.S.C. § 815(c)(3).

dispense discipline directly. We do not lightly cast aside a comprehensive enforcement regime like the CSRA, which was designed to govern the federal employer-employee relationship and to normalize the procedures for sanctioning federal employee misconduct. Congress enacted the CSRA in 1978, Pub.L. No. 95–454, 92 Stat. 1111 (codified as amended in sections of 5 U.S.C. (1996)), specifically to replace "the haphazard arrangements for administrative and judicial review of personnel action," *United States v. Fausto,* 484 U.S. 439, 444, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988), and "the prior 'patchwork' system of laws governing federal employment...." *Wildberger v. FLRA,* 132 F.3d 784, 787 (D.C.Cir.1998). It seems implausible that the identical Congress, without any discussion, would make a considered judgment to create a totally different mechanism for malfeasance by federal officials involved in the mining arena. In addition, reading section 105(c) to encompass MSHA officials would also displace the basic quadrumvirate of remedies—*Bivens,* the Federal Tort Claims Act ("FTCA"), the Tucker Act, and the Administrative Procedure Act—otherwise available for those claiming legally redressable injury from federal action (or inaction).[14] *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); 28 U.S.C. § 2671 *et seq.* (FTCA); 28 U.S.C. §§ 1346, 1491 and other scattered sections of 28 U.S.C. (Tucker Act); 5 U.S.C. §§ 702–06 (APA). In the absence of even a congressional hint pointing in that direction, we will not presume this additional mechanism for miners seeking redress.

Those provisions of the Mine Act discussing the quiver of remedies and penalties available to the Secretary and the Commission lend further support to our construction of the Act's anti-discrimination provision. Section 105(c)(2) and (c)(3), for example, each grant the Commission power to order "the rehiring or reinstatement of the miner to his former position with back pay and interest," 30 U.S.C. § 815(c)(2)-(3), while section 105(c)(3) additionally provides authority to order "such remedy as may be appropriate.". Though the residual grant of equitable authority can be read as permissive, the focus of the provision as well as the nature of the enumerated remedies strongly imply that Congress was considering remedies limited to those available against mine operators and their agents. This focus can be seen as well in the Senate Report accompanying passage of the Mine Act, which contains a similar trilogy of remedies—"reinstatement with full seniority rights, back-pay with interest, and recompense for any special damages sustained as a result of the discrimination." S.Rep. No. 95–181 at 37, 1977 U.S.C.C.A.N. at 3437. In light of this purposive statement, we believe it follows that the residual grant of authority to order "any other remedy" is designed to ensure that the Commission can fully compensate miners for unforeseeable damages; it cannot by itself carry the heavy baggage of extending the statute's coverage to MSHA employees.

The two additional provisions to which section 105(c) crossreferences also evidence an intent to limit the meaning of the term "persons" to those affiliated or associated with mining operations. Relevant language in section 105(c) provides that "[v]iolations by a person of paragraph (1) [forbidding discrimination] shall be subject to the provisions of sections 818 and 820(a) of this title." 30 U.S.C. § 815(c)(3). 30 U.S.C. § 818 gives the Secretary authority to institute a civil action for relief against a *mine operator,* and grants jurisdiction to the federal district courts to provide whatever relief they deem appropriate. 30 U.S.C. § 820(a) allows the Secretary to assess civil penalties of up to $10,000 against *mine operators* for violations of either the Mine Act or any of the mandato-

14. Under the UMWA's construction, MSHA officials could risk section 105(c) "retaliation" complaints whenever they took *any* official action unfavorable to miners.

ry health and safety standards promulgated by the Secretary. Like the remedies specifically mentioned in section 105(c), neither provision provides for remedies extending beyond the individuals and entities involved in the mine industry.

The legislative history only reinforces our construction of the Mine Act's text and structure; not a single word in any of the committee reports accompanying its passage even remotely intimates that the anti-discrimination provisions were intended to apply to the actions of government employees taken under color of their authority. The Mine Act responded to a series of highly publicized mine disasters which engendered a pervasive belief that the existing administrative regime had grossly failed to ensure compliance with safety standards. Exercising its oversight authority, Congress had previously identified two broad areas—standard making and penalty assessment/collection—in which it deemed the Department of Interior's enforcement regime excessively lax. *See* S.Rep. No. 95–181, at 8–9, 15–16, *reprinted in* 1977 U.S.C.C.A.N. at 3408–09, 3415–16. Accordingly, Congress removed authority over mine safety from the Interior Department and placed it in the Department of Labor which, it reasoned, already supervised most other industries through the Occupational Safety and Health Act. The Mine Act also created the independent Federal Mine Safety and Health Review Commission, providing a specialized adjudicative body in which miners and operators alike could expeditiously contest orders and proposed penalties issuing from the Labor Department.

The Senate Report repeatedly references the need for miners and mine operators each to share responsibility for ensuring compliance with mine safety regulations. Believing miners to be in the best position to detect and report hazards, the Act created a number of mechanisms through which they could notify the MSHA of dangerous conditions, including written complaints, requests for inspection, and the right to point out hazards. *See* 30 U.S.C. § 813(g). According to the Report, section 105(c) was enacted to protect miners "against any possible discrimination which they might suffer as a result of their participation" in this collective effort to promote safety. *See* S.Rep. No. 95–181, at 35, 1977 U.S.C.C.A.N. at 3435. Though Congress did not explicitly name those it envisaged would fall inside and outside of its anti-discrimination prescription, its attention clearly focused upon mine operators, as well as "any other person directly or indirectly involved" with them. *Id.* at 36, 1997 U.S.C.C.A.N. at 3436. While this additional language clearly provided a bulwark against third-party retaliation under the behest of a mine owner or operator, nothing in the legislative history signals that Congress considered it as radically extending the Act's coverage to MSHA employees.

Overall then, nothing in the text, structure, or legislative history of the Mine Act provides enough support for the UMWA's contention that section 105(c) applies to MSHA officials acting under color of their authority to overcome the natural presumption against such an inference. Indeed, the thrust of the text, statutory structure and legislative history goes the other way. We recognize that it might be more convenient for miners to pursue their complaints against MSHA officials under this provision, particularly in light of the expedited regime for processing claims that the Mine Act mandates. In its current form, however, the Mine Act does not express any clear congressional intent to displace or augment the alternative avenues of relief available to those claiming injury from official action. It is for the legislative branch to balance the benefits of any extension against the costs thereby engendered.

## III. Conclusion

For the foregoing reasons, we hold that MSHA officials acting under color of their authority are not amenable to suit under section 105(c) of the Mine Act. According-

ly, we grant the petition for review, vacate the Commission's decision, and remand for the Commission to dismiss the complaints.

*So ordered.*